Natalie Marcin SBN# 351072
EarthSpotter
2801 B Street, Unit 2006
San Diego, CA 92102
Email: natalie@earthspotter.org
Telephone: (619) 320 5270

*Attorney for Plaintiff EarthSpotter*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EarthSpotter, a California non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>South Gate Engineering, LLC, a California limited liability company,<br><br>Defendant. | Case No. 5:26-cv-01432-JGB-SP<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.)** |

EarthSpotter ("Plaintiff") by and through counsel, hereby alleges:

## I. <u>Jurisdiction and Venue</u>

1. Plaintiff brings a civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. ("Clean Water Act" or "CWA"). 33 U.S.C. § 1365. Under 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201, this Court has subject matter jurisdiction over the parties and this action.

2. On December 13, 2025, Plaintiff mailed a 60-day notice letter to South Gate Engineering, LLC ("Defendant" or "South Gate") as the owner and/or operator of the industrial manufacturing facility located at 13477 Yorba Avenue, Chino, California 91710 ("Facility"). The Notice Letter detailed the Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ)*, and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("Permit"). A true and correct copy of the Notice Letter and its enclosures is attached as **Exhibit 1** and incorporated herein.[1]

3. Plaintiff mailed the Notice Letter via certified mail to the Facility's address (13477 Yorba Avenue, Chino, California 91710) and the Defendant's Agent for Service of Process, located at the same address.

4. Pursuant to 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A), Plaintiff mailed the Notice Letter to (1) the Administrator of the Environmental Protection Agency ("EPA"), (2) the Regional Administrator of EPA Region IX, (3) the Executive Officer of the California State Water Resources Control Board ("State Water Board"), and (4) the Executive Officer of the Santa Ana Regional Water

[1] Claims and allegations not pursued have been redacted from the Notice Letter for clarity.

Quality Control Board ("Regional Board").

5. More than sixty (60) days have passed since the Notice Letter was mailed to the Defendant and the State and Federal agencies. On information and belief, neither the State nor Federal agencies has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and this Complaint. 33 U.S.C. § 1365(b)(1)(B). No previous administrative penalty issued under CWA Section 309(g) prevents this action from proceeding.

6. The violations occurred within the Central District of California. Thus, venue is proper under 33 U.S.C. § 1365(c)(1).

## II. Introduction

7. Plaintiff seeks relief for Defendant's substantive and procedural violations of the Permit and CWA occurring at the Facility.

8. Defendant has failed to follow numerous Permit provisions designed to prevent contaminated storm water from discharging into the Chino Municipal Separate Storm Sewer System ("MS4"). The MS4 flows southwest into Chino Creek, which feeds into the Prado Basin Management Plan. Chino Creek ultimately drains into the Santa Ana River, then into the Santa Ana Tidal Prism, and empties into the Pacific Ocean. These downstream waters are collectively referred to as the Receiving Waters.

9. This failure results in devastating impacts to (1) the flora, fauna, and ecology generally, and (2) the public, including EarthSpotter's members, who use the Receiving Waters to recreate.

10. Pollution from the Facility threatens the overall health of the Receiving Waters and, in turn, the plants and animals that depend on these habitats. When these natural systems are damaged, the public, including EarthSpotter's members, loses valuable recreational, educational, and scientific opportunities. Such contamination can also pose risks to human health. As a result, EarthSpotter's members are less inclined to visit or recreate near waters known to contain harmful

metals, high nutrient levels, and other pollutants.

## III. Parties

11. South Gate Engineering, LLC ("South Gate") is a California limited liability company that owns and/or operates the Facility.

12. EarthSpotter is a California non-profit public benefit corporation. Its mailing address is2801 B Street, Unit 2006, San Diego, California 92102, and its telephone number is (619) 320 5270. EarthSpotter is committed to identifying environmental pollution and reducing its impacts on natural ecosystems—protecting clean water, air, and land, and addressing the effects of climate change on natural resources throughout California. In pursuit of its mission, EarthSpotter works to ensure compliance with environmental statutes, regulations, and other legal protections, including the CWA.

13. Plaintiff brings this action on behalf of its members. EarthSpotter's membership includes individuals who live, work, travel, and engage in recreational activities throughout Riverside and San Bernardino counties. Among them are members who were born and raised in the region and hold deep personal connections to its natural resources.

14. Plaintiff's membersuse and enjoy the Receiving Waters, along with the adjacent riparian, wetland, and beach areas, for recreational and aesthetic purposes, including wildlife observation. They also participate in cleanup, restoration, and conservation efforts within these waters and their surrounding riparian, wetland, and beach environments. They are dedicated to the study, protection, public education, and conservation of the ecosystems, including the species, wildlife, and habitats, that are affected by the quality of the waters into which Defendant's Facility discharges polluted storm water.

15. Given the ecological importance and aesthetic and recreational significance of the Receiving Waters, Plaintiff's members use and enjoy these waters and surrounding ecosystems and wetlands for a wide range of activities. They

frequently visit various areas downstream from the Facility for fishing, hiking, biking, enjoyment of natural open spaces, general aesthetic appreciation, birdwatching, and observation of other fauna, including butterflies, fish, reptiles, and mammals. Plaintiff's members intend to continue all of the aforementioned activities.

16. The discharge of storm water with elevated levels of pollutants from the Facility reduces Plaintiff's members' use and enjoyment of the Receiving Waters and the bays, beaches, and surrounding ecosystems into which they flow. Defendant's discharges diminish their ability to engage in recreational, aesthetic, restoration, conservation, educational, and professional pursuits in these downstream waters and ecosystems. Aware of the pollution concerns discussed herein, Plaintiff's members avoid or limit activities such as swimming, fishing, kayaking, and other contact with the Receiving Waters when they would otherwise choose to participate. The discharge of pollutants, including toxic pollutants, harms aquatic life and riparian species that Plaintiff's members observe, consume, and contemplate spiritually, while also degrading the ecosystems and habitats they work to protect and enjoy. Plaintiff's members have a vested interest in healthy ecosystems and thriving natural flora and fauna populations, and their reduced use and enjoyment of the Receiving Waters is directly traceable to Defendant's pollutant-laden storm water discharges.

17. The legal violations alleged in this Complaint cause direct injury to the recreational, aesthetic, restoration, conservation, educational, and professional interests of Plaintiff's members. These injuries are concrete and particularized to Plaintiff and each of its affected members.

18. Unless the relief sought in this Complaint is granted, these interests have been, are being, and will continue to be adversely and irreparably harmed by Defendant's failure to comply with the CWA. Defendant's discharges of storm water with elevated pollutant levels are ongoing and will continue, as Defendant

has not corrected the practices responsible for these violations. These injuries are actual, concrete, and traceable to Defendant's conduct, and redressable by the requested relief. If successful, this action will require Defendant to bring its discharges from the Facility into compliance with the CWA, thereby reducing pollutant discharges to the affected Receiving Waters and directly benefiting Plaintiff's members by alleviating the harms they currently suffer.

19. Defendant's failure to submit accurate and complete information to SMARTS[2] in accordance with the Permit provisions designed to protect the Receiving Waters causes informational injuries to Plaintiff's members.

20. Plaintiff's members have been deprived of their right to obtain complete and accurate information regarding Defendant's compliance with the Permit. The informational provisions of the Permit have been instituted by relevant regulatory agencies to protect the Waters of the United States.

21. Plaintiff's members have an interest in accurate information regarding Defendant's discharges. Defendant's failure to accurately report and monitor impedes Plaintiff's members' ability to fully use and enjoy the Receiving Waters for aesthetic, recreational, educational, and spiritual purposes.

22. An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiff.

## IV. Legal Background

23. The CWA prohibits the discharge of polluted storm water associated with industrial activity unless the discharger obtains a National Pollutant Discharge Elimination System ("NPDES") permit and complies with its terms. 33 U.S.C. § 1342(p); 40 C.F.R. § 122.26(b)(14).

24. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

---

[2] Stormwater Multiple Application and Report Tracking System ("SMARTS").

25. The Receiving Waters are Waters of the United States.

26. The CWA requires all storm water dischargers regulated under the CWA to achieve technology-based effluent limitations using the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)-(iii).

27. The CWA authorizes private citizens to sue to enforce the provisions of the Permit. 33 U.S.C. § 1365(a)(1), (f)(6); *Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1139 (9th Cir.1998).

28. The CWA allows states to administer its own EPA-approved NPDES permitting program, including storm water NPDES. The EPA has approved California's NPDES permitting program. The State Water Board issues these permits. Cal. Water Code § 13001.

29. The State Water Board issued a general NPDES permit for industrial manufacturing facilities, which is the Permit as described in Section I, *supra*. Before beginning operations, a facility subject to the Permit that wishes to discharge storm water offsite must apply for coverage by submitting a Notice of Intent ("NOI") to the State Water Board to enroll under the Permit and comply with the Permit's terms.[3] Permit § I.A.17.

30. Industrial manufacturing facilities with SIC code 3443 (Fabricated Plate Work (Boiler Shops)) require Permit coverage. Permit, Attachment A.

A. <u>Discharge Prohibitions</u>

31. The Permit's discharge prohibitions prohibit (1) all storm water and non-storm water discharges ("NSWDs") not specifically authorized by the Permit; (2) storm water discharges and NSWDs that "cause or threaten to cause pollution, contamination, or nuisance as defined in [S]ection 13050 of the Water Code;" and

---

[3]A facility may alternatively apply for an individual NPDES permit, though this is rare. In either case, permit coverage and compliance are required.

(3) "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans [], or statewide water quality control plans," among others. Permit § III.

32. Unauthorized NSWDs, such as spills, leaks, and dumping, must be eliminated through the "implementation of Best Management Practices" ("BMPs"). Permit § I.C.28.

33. Section 13050(k) of the Water Code defines "pollution" as the "alteration of the quality of waters" that adversely affects the receiving water's Beneficial Uses.

34. Section 13050(l) of the Water Code defines contamination as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

35. The California Toxics Rule ("CTR") is an applicable water quality criteria in California promulgated to protect receiving water Beneficial Uses. The Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Fact Sheet ("CTR Fact Sheet") explains that California "must use the criteria together with the State's existing water quality standards when controlling pollution in inland waters and enclosed bays and estuaries." Fact Sheet at 2. Thus, discharges that exceed the CTR cause or threaten to cause pollution, contamination, and nuisance.

36. The Water Quality Control Plan for the Santa Ana River Basin ("Basin Plan") prohibits toxic substances that "adversely affect [B]eneficial [U]ses." Basin Plan at 4-7. The CTR established criteria to protect the Beneficial Uses of California waters from toxic substances. Thus, exceeding CTR criteria constitutes a violation of the Basin Plan's toxicity limitation.

B. <u>Effluent Limitations</u>

37. The Permit requires dischargers to "implement BMPs [Best Management Practices] that comply with the" BAT for toxic and non-conventional pollutants and BCT for conventional pollutants. Permit § V.A.

38. Toxic pollutants include copper, lead, and zinc, among others. 40 C.F.R. § 401.15.

39. Conventional pollutants include total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite ("N+N"), iron, phosphorus, and enterococcus, among others. 40 C.F.R. § 401.16.

40. Dischargers must implement BAT/BCT compliant BMPs to "reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability." Permit § V.A.

41. The EPA's *NPDES Storm Water Multi-Sector General Permit for Industrial Activities* ("MSGP")'s benchmarks ("EPA Benchmarks") and the Permit's Numeric Action Levels ("NALs") provide numeric objectives to evaluate pollutant discharges in storm water.

42. EPA Benchmarks and NALs indicate "if best management practices are effective and if additional measures are necessary to control pollutants." Accordingly, exceedances of EPA Benchmarks and NALs indicate that the Facility has not implemented BMPs that comply with BAT and BCT standards. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

43. Failing to develop or implement BMPs that meet BAT and BCT standards violates Permit Section V.A. 33 U.S.C. § 1311(b); Permit § V.A.

C. Storm Water Pollution Prevention Plan Requirements

44. The Permit requires that dischargers develop and implement a site-specific Storm Water Pollution Prevention Plan ("SWPPP") r and Monitoring Implementation Plan ("MIP") designed to reduce and prevent pollutants from contaminating storm water. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, develop and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and reduce or prevent the discharge of

polluted storm water from industrial facilities. Permit § X.C.

45. The SWPPP should outline the necessary BMPs to meet BAT/BCT standards at the facility, based on site-specific conditions and pollutants, and must be revised as necessary to reflect any changes.

46. The SWPPP must include the following non-exhaustive elements:

(1) A narrative description and summary of all industrial activities, potential pollutant sources, and potential pollutants;

(2) A site map showing the stormwater conveyance system, discharge points, flow direction, areas of actual or potential pollutant contact, nearby water bodies, and all pollutant control measures, among others;

(3) A description of storm water management practices;

(4) A description of the BMPs that will be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges;

(5) Procedures and BMPs for identifying and eliminating non-storm water discharges;

(6) The locations where significant materials are shipped, stored, received, or handled, including typical quantities and handling frequency;

(7) A description of dust- and particulate-generating activities;

(8) A list of the individuals responsible for developing and implementing the SWPPP, along with their current roles;

(9) A Monitoring and Implementation Plan ("MIP") that ensures compliance with the Permit including identifying monitoring tasks, discharge locations, visual observation and sampling procedures, justification for alternative discharge locations or sampling reductions if applicable, and an example chain of custody. The MIP also enumerates a team designated to implement the Permit requirements. Permit § X.A-I.

47. Dischargers must review their SWPPP at least once per year and update it as needed to remain in compliance with the Permit. Any significant revision to the

SWPPP must be certified and submitted through SMARTS within 30 days. Permit § X.A-I.

D. Monitoring and Reporting

48. The Permit requires the Facility to monitor storm water discharges through (1) monthly visual observations, (2) sampling event observations, and (3) sampling its storm water runoff. Permit § XI.

49. At least once per month, the Facility must inspect each drainage area for prior, current, or present unauthorized NSWDs, authorized NSWDs, and associated BMPs, and outdoor industrial activities and respective BMPs implementation. While sampling, the discharger shall observe whether the storm water had any floating or suspended materials, oil and grease, turbidity, odors, and potential sources of pollutants.

50. With respect to storm water sampling, a facility must collect four samples per reporting year: two during the first half of the reporting year (July 1–December 31) and two during the second half (January 1–June 30). If the facility participates in a compliance group, it is required to collect only one sample in each half of the reporting year (two total). All samples must be collected during a Qualified Storm Event ("QSE"). A QSE occurs when a precipitation event produces a "discharge for at least one drainage area; and . . . preceded by 48 hours with no discharge from any drainage area." The sample must be collected within four hours of the start of the discharge or the "start of the facility operations if the QSE occurs within the previous 12-hour period." Permit § XI.B.

51. The facility must monitor for (1) TSS, (2) oil and grease, (3) pH, (4) any SIC code specific parameters, (5) potential pollutants associated with the facility's industrial sources for which the Receiving Waters have 303(d) impairments or approved TMDLs, and (6) "identified by the [d]ischarger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment," among others. Permit § XI.B.6. All sampling results

must be uploaded to SMARTS within thirty days of obtaining said results. Permit § XI.B.11.

E. Annual Reporting

52. Each year, by July 15th, the discharger "shall certify and submit via SMARTS an Annual Report." The Annual Report shall include: (1) a compliance checklist indicating the facility complied with and "addressed all applicable requirements" of the Permit, (2) an explanation for any non-compliance, (3) any SWPPP amendments within the reporting year, and (4) the date of the Annual Evaluation. The Annual Evaluation consists of a single comprehensive review of the facility's storm water practices, including an assessment of the prior year's sampling, visual monitoring, and observation records; an inspection of the facility's industrial activities and associated potential pollutants; an examination of drainage areas; an evaluation of any new BMPs and related equipment; and a review of the overall effectiveness of the BMPs. Permit §§ XV, XVI.

**V. Facts**

53. The Facility "designs and manufactures pressure vessels, tanks, structural components, and piping." SWPPP § 1.

54. Defendant filed an NOI on April 25, 2002. The Facility was issued the Waste Discharge Identification Number ("WDID") 8 36I017215.

55. The Facility uploaded its most recent SWPPP and Site Map to SMARTS on December 13, 2024.

56. To effectuate its manufacturing, the Facility sandblasts, paints, recycles paint, machines, welds, cuts plates, rolls, stacks, hydro tests, generates scrap metal and refuse, operates, stores, and maintains industrial equipment like trucks, forklifts, and compressors, including using and storing acetone, oil, and diesel, ships and receives, and stores waste.

57. Numerous industrial operations and materials at the Facility are located outdoors without sufficient roofing or other protection to keep storm water and non-

storm water flows from contacting pollutant sources. In many areas, the Facility also lacks proper secondary containment or other necessary treatment controls to stop contaminated storm water or non-storm water from leaving the site.

58. Pollutants generated indoors or beneath partial cover also routinely escape through wind dispersion, vehicle and foot traffic, and other pathways, spreading contamination throughout the Facility grounds. Pollutants from the Facility's industrial activities are, and have been, transported across the site and beyond its boundaries through tracking by vehicles and employees, wind, and storm water movement entering and exiting the property. As a result, employees, customers, and vehicles carry metals, nutrients, sediment, oil and grease, and other contaminants off-site.

59. Industrial activities occur across the entire site, thus the entire Facility requires coverage under the Permit. The Permit's definition of "storm water associated with industrial activities," and its discussion of material handling, also require coverage for any storm water from non-industrial areas that commingles with industrial storm water. Because the Facility lacks Best Management Practices or other controls to keep these flows separate, industrial storm water mixes with non-industrial storm water throughout the site. Accordingly, all storm water discharges from the Facility must be covered by the Permit.

60. The Facility discharges elevated levels of the following pollutants: total suspended solids ("TSS"), nitrogen, phosphorus, aluminum, copper, iron, magnesium, zinc, and pH-affecting substances. Exhibit 1. As discussed in more detail in Sections V.C and V.D infra, these pollutants stem from the Facility's operations and manufacturing activities.

A. <u>Discharge Prohibitions</u>

61. "Where consideration of a dilution allowance or mixing zone is not permitted by the water quality standards or is not appropriate, the relevant water quality criterion must be attained at the point of discharge." U.S. EPA's NPDES Permit

Writer Manual § 6.2.3. On information and belief, the Facility does not have a dilution allowance or mixing zone, thus the Facility must meet applicable water quality objectives and criteria at the point of discharge.

62. The Facility has discharged and continues to discharge storm water that causes or threatens to cause pollution, contamination, and nuisance through exceeding applicable water quality objectives, criteria, benchmarks, and standards established to protect water quality, Beneficial Uses, human health, and the environment.

63. EarthSpotter obtained a storm water sample from the public right of way, as verified by San Bernardino County's public assessor map.

64. The Facility discharges TSS, nitrogen, phosphorus, aluminum, copper, iron, magnesium, zinc, and pH-affecting substances in excess of respective objectives and standards in violation of Permit Discharge Prohibition III.C. For example, on February 19, 2024, the Facility discharged concentrations of zinc at 4.34 mg/L, over thirty-six times the CTR limit of 0.12 mg/L. Discharging pollutants in excess of water quality objectives and standards designed to protect water quality pollutes and contaminates the Receiving Waters and threatens their Beneficial Uses.

65. The Facility has discharged and continues to discharge storm water in excess of Basin Plan WQO and CTR criteria in violation of Permit Discharge Prohibition III.D. Indeed, the Facility has discharged copper and zinc in excess of CTR criteria.

B. <u>Effluent Limitations</u>

66. Defendant has failed to develop adequate BMPs that comply with BAT/BCT technology.

67. The EarthSpotter sample and the Facility's own sampling indicate that the Facility's discharges exceed and continue to exceed NALs and EPA Benchmarks for TSS, nitrogen, aluminum, iron, magnesium, and zinc. For example, on October 14, 2025, the Facility discharged magnesium at concentrations of 6.7 mg/L, over 100 times higher than the Annual NAL of 0.064 mg/L. Exhibit 1. Thus, sampling

data collected indicates the Facility has failed and continues to fail to develop and/or implement BMPs that comply with the BAT/BCT requirements in violation of the Permit Effluent Limitation V.A.

68. Visual observations and photographs confirm that the Facility fails to implement basic BMPs such as covering industrial materials or storing them under a shelter. For example, on the October 14, 2025 rain event, the Facility left uncovered (1) industrial materials and products in various stages like steel tubing, (2) pallets, (3) industrial waste, (4) dumpsters, and (5) industrial tools. Exhibit 1.

69. The images in Exhibit 1 were taken on the public right of way as confirmed by the San Bernardino County's public assessor map.

C. SWPPP

70. Defendant operates the Facility under a SWPPP that is inadequately developed and implemented.

71. The Facility's SWPPP fails to reflect site conditions.

72. The Facility's SWPPP fails to list all industrial materials onsite including locations where the material is stored, received, shipped, handled, the typical frequencies and quantities in violation of Permit Section X.F. In particular, the SWPPP lacks completeness. For example, the SWPPP lacks quantity and frequency for each industrial material.

73. The Facility's SWPPP fails to provide an adequate associated pollutant assessment for its activities in violation of X.G.2.ii. In particular, the SWPPP fails to identify all potential pollutants onsite based on its industrial processes. EarthSpotter's storm water sampling indicates that the Facility discharges nitrogen, phosphorus, aluminum, copper, magnesium, and zinc in excess quantities, linked to its industrial operations, such as forklift tires (zinc), steel manipulation (phosphorus and copper), and painting (aluminum, magnesium, and nitrogen), among others. Nonetheless, the Facility fails to identify these associated pollutants and include the parameters in the MIP.

74. The Facility's SWPPP fails to acknowledge dust generating activities and the associated information in violation of Permit Section X.G.1.c. The Facility cuts and welds sheet metal and thus has the potential to generate metal particulate matter.

75. The Facility's SWPPP fails to provide an adequate associated pollutant assessment for its activities in violation of X.G.2.ii. In particular, the SWPPP lacks specificity. For example, for the shipping and receiving activities, the SWPPP merely lists "metals" without identifying the specific metals commonly associated with those activities. EarthSpotter's storm water sampling indicates that the Facility discharges magnesium, copper, phosphorus, and nitrogen linked to its industrial operations, such as sheet metal work, in addition to the pollutants identified in the SWPPP.

76. The Facility's SWPPP fails to provide site-specific BMPs and the associated narrative in violation of Permit Section X.H.4. For each BMP, the Facility must identify the pollutant that BMP is designed to reduce, the frequency or conditions when implemented, location, person responsible, equipment and tools necessary for the BMP, and procedures and instructions for the BMP. For example, the Facility fails to identify covering industrial materials and equipment prior to rain events as BMP, a required BMP per Permit Section X.H.1.a.v. As the Facility failed to identify all required BMPs, the Facility likewise has failed to provide the associated information.

77. The Facility has failed to update the Facility's SWPPP in accordance with the requirements of the Permit. The Permit mandates that any substantial SWPPP modification be kept onsite and submitted to SMARTS within thirty days. However, despite the Facility's elevated pollutant levels in storm water discharges and its extensive outdoor storage practices, the SWPPP has remained unchanged.

D. Monitoring and Reporting

78. Defendant operates the Facility with an inadequate MIP.

79. Defendant fails to conduct adequate monitoring and reporting at the Facility.

80. The Facility has failed and continues to fail to collect and analyze its storm water discharges for all parameters required by the Permit. EarthSpotter's sampling results demonstrate that the Facility releases excessive concentrations of magnesium, copper, phosphorus, and total nitrogen attributable to its industrial activities, such as painting, welding and steel manipulation, and industrial equipment usage, among others. Nonetheless, the Facility fails to analyze samples for these parameters.

81. The Facility has failed, and continues to fail, to collect the required four storm water samples each Reporting Year. Exhibit 1. This failure to obtain the requisite samples constitutes an ongoing and continuous violation of the Permit.

82. Improper sampling procedures or handling is occurring at the Facility. Indeed, the Facility did not deliver the samples to the lab within 48 hours as mandated by the Permit, which begs the question of proper storage and handling.

83. As discussed in Sections V.B and V.C supra, the Facility has failed to implement BMPs sufficient to prevent the discharge of pollutants. As a result, the Facility has also failed to conduct adequate monitoring as required by the Permit, including performing the required monthly visual observations of BMPs implementation.

E. <u>Annual Reports</u>

84. The Facility has submitted multiple Annual Reports, each accompanied by certifications asserting that the Facility was in full compliance with the Permit.

85. As outlined in this pleading, the Facility has violated—and continues to violate—numerous provisions of the Permit for which the Facility claims compliance such as adequate monitoring. Thus, these certifications are erroneous and the Facility's Legally Responsible Person or Duly Authorized Representative should have known the Facility failed to comply with Permit requirements and these certifications were false.

86. The Facility's Duly Authorized Representative, Luis Arellano, submitted

inaccurate annual reports, to SMARTS, on May 23, 2025, June 21, 2024, August 29, 2023, July 15, 2022, and July 15, 2021.

87. Defendant's 2021, 2022, 2023, 2024, and 2025 Annual Reports state that copper and nutrients are not present at the Facility. As discussed in Paragraphs 73 and 80, and Exhibit 1, this is not true.

88. Defendant's 2024 and 2025 Annual Reports indicate that Defendant did not collect the required number of storm water samples due to lack of qualifying events. As discussed in Paragraph 81, and Exhibit 1, NOAA Data, on information and belief, this is not true.

89. Defendant's 2021, 2022, and 2023 Annual Reports indicate that Defendant did collect the required number of storm water samples. As discussed in Paragraph 81, and Exhibit 1, this is not true.

90. Defendant knew, or had it conducted the inquiry required by the Permit's certification, would have known, that the statements identified above in the Annual Reports, which Defendant certified through its Duly Authorized Representative as true, accurate, and complete, were inaccurate.

91. The inaccurate and/or misleading Annual Reports continue to be maintained on SMARTS.

92. The Facility's failure to meet the Permit's reporting obligations, along with the submission of false or misleading information, places the Facility in ongoing, daily noncompliance with the Permit.

## VI. <u>Claims for Relief</u>

### <u>FIRST CAUSE OF ACTION</u>

**The Facility discharges contaminated storm water in violation of the Permit and CWA.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

93. The foregoing allegations are incorporated herein by reference.

94. Defendant is a responsible party under the CWA.

95. Defendant has discharged and continues to discharge contaminated storm water that causes or threatens to cause pollution, contamination, or nuisance in the Receiving Waters in violation of Permit Section III.C.

96. Defendant has discharged and continues to discharge contaminated storm water in violation of the applicable Basin Plan in violation of Permit Section III.D.

97. Defendant has been in violation of Permit Section III since at least December 13, 2020. Defendant's violations are ongoing and continuous.

98. Each time storm water discharges from the Facility in violation of each Permit provision constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

99. For each violation of each Permit Section III.C and III.D, the Facility is subject to civil penalties.

## SECOND CAUSE OF ACTION

**The Facility fails to implement BMPs that comply with BAT/BCT technology.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

100. The foregoing allegations are incorporated herein by reference.

101. Defendant is a responsible party under the CWA.

102. Defendant has failed and continues to fail to reduce or prevent contaminating storm water through BAT/BCT compliant BMPs in violation of Permit Section V.A.

103. Defendant has been in violation of Permit Section V.A since at least December 13, 2020. Defendant's violations are ongoing and continuous.

104. Each day the Facility operates without developing BAT/BCT compliant BMPs constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

105. Each day the Facility operates without implementing BAT/BCT compliant BMPs constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

106. For each violation of Permit Section V.A, the Facility is subject to civil penalties.

**THIRD CAUSE OF ACTION**

**The Facility fails to develop and implement an adequate SWPPP and MIP.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

107. The foregoing allegations are incorporated herein by reference.

108. Defendant has failed and continues to fail to develop an adequate SWPPP in violation of Permit Section X.

109. Defendant has failed and continues to fail to implement an adequate SWPPP in violation of Permit Section X.

110. Defendant has failed and continues to fail to revise the SWPPP in violation of Permit Section X.

111. Defendant has failed and continues to fail to develop an adequate MIP in violation of Permit Section X.

112. Defendant has failed and continues to fail to implement an adequate MIP in violation of Permit Section X.

113. Defendant has been in violation of Permit Section X since at least December 13, 2020. Defendant's violations are ongoing and continuous.

114. Each day the Facility operates without developing an adequate SWPPP constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

115. Each day the Facility operates without implementing an adequate SWPPP constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

116. Each day the Facility operates without revising the SWPPP on an ongoing basis constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

117. Each day the Facility operates without developing the MIP constitutes

separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

118. Each day the Facility operates without implementing the MIP constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

119. For each violation of Permit Section X, the Facility is subject to civil penalties.

## FOURTH CAUSE OF ACTION

**The Facility fails to conduct adequate monitoring and reporting.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

120. The foregoing allegations are incorporated herein by reference.

121. Defendant has failed and continues to fail to conduct adequate monthly monitoring in violation of Permit Section XI.

122. Defendant has failed and continues to fail to collect the required number of storm water samples in violation of Permit Section XI.

123. Defendant has failed and continues to fail to analyze its storm water samples for all required constituents in violation of Permit Section XI.

124. Defendant has failed and continues to fail to collect and store its storm water samples in accordance with the Permit in violation of Permit Section XI.

125. Defendant has been in violation of Permit Section XI since at least December 13, 2020. Defendant's violations are ongoing and continuous.

126. Each failure to adequately monitor constitutes a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

127. For each violation of Permit Section XI, the Facility is subject to civil penalties.

## FIFTH CAUSE OF ACTION

**The Facility fails to submit accurate annual reports.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

128. The foregoing allegations are incorporated herein by reference.

129. Defendant has failed and continues to fail to submit accurate Annual Reports in violation of Permit Section XVI.

130. Defendant has failed and continues to fail to submit accurate Annual Reports in violation of Permit Sections XXI.K and XXI.L.

131. Each day the Facility operates without accurate Annual Reports is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

132. Defendant has been in violation of Permit Section XVI since at least December 13, 2020. Defendant's violations are ongoing and continuous.

133. Defendant has been in violation of Permit Section XXI.K-L since at least December 13, 2020. Defendant's violations are ongoing and continuous.

134. For each violation of Permit Sections XVI and XXI.K-L, the Facility is subject to civil penalties.

## VII. Relief Request

135. Plaintiff respectfully requests the Court grant the following relief:

(1) A court order declaring Defendant in violation of Sections 301(a) and (b) of the CWA for the violations alleged herein.

(2) A court order enjoining Defendant from discharging pollutants in violation of the CWA and Permit.

(3) A court order requiring Defendant to implement injunctive measures that rectify Defendant's procedural and substantive violations of the CWA and Permit.

(4) A court order assessing civil penalties for the aforementioned violations at $68,446 per day per CWA violation that occurred after November 2, 2015 and assessed on or after January 9, 2025.

(5) A court order awarding reasonable fees and costs to Plaintiff including attorney fees and witness fees pursuant to Section 505(d) of the CWA.

(6) Any other relief the Court deems appropriate.

Date: October 14, 2026

Respectfully,

EarthSpotter

By: /s/Natalie Marcin

Natalie Marcin
Attorney for Plaintiff
EarthSpotter
Email: natalie@earthspotter.org